**In re Anonymous No. 99 D.B. 92 (No. 2)**

Disciplinary Board Docket no. 99 D.B. 92.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

FRIEDMAN, *Member,* October 6, 1995—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court

with respect to the above-captioned petition for reinstatement.

## I. HISTORY OF PROCEEDINGS

The Supreme Court of Pennsylvania issued an order dated October 2, 1992 suspending petitioner from the practice of law. The order was entered in accordance with Pa.R.D.E. 214(d) on the basis of petitioner's conviction in the United States District Court for the [    ] District of Pennsylvania for two counts of income tax evasion in violation of 26 U.S.C. §7201.

As a result of his conviction, petitioner was sentenced to a 12-month period of incarceration to be followed by supervised release for a period of three years. Petitioner was also fined $25,000. Petitioner will remain on supervised release until August 17, 1996.

On November 6, 1992 Office of Disciplinary Counsel filed a petition for discipline based upon petitioner's conviction. On November 30, 1992 respondent filed an answer to the petition for discipline.

The matter was referred to Hearing Committee [    ] on December 18, 1992. On May 12, 1994 the Hearing Committee filed its report recommending a 29-month suspension.

On September 27, 1994 the Disciplinary Board of the Supreme Court recommended a 30-month suspension retroactive to October 2, 1992. On October 24, 1994 petitioner was suspended from the practice of law for a 30-month period retroactive to October 2, 1992.

On November 21, 1994 petitioner filed his petition for reinstatement. A hearing on the petition was held before Hearing Committee [    ] on April 3, 1995. On July 10, 1995 the Hearing Committee filed its report

recommending that petitioner's petition for reinstatement be granted. Letters from petitioner and respondent were received advising that no exceptions to the recommendation would be filed.

The matter was adjudicated at the August 17, 1995 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## II. FINDINGS OF FACT

The board adopts the Hearing Committee's findings of fact.

(1) Petitioner was born in 1939 and was admitted to the practice of law in the Commonwealth of Pennsylvania in 1967. His last registered address for the practice of law was [    ]. (PX 1.)

(2) Petitioner was indicted by a federal grand jury in December of 1991 on five counts of tax evasion, in violation of 26 U.S.C. §7201, and five counts of filing false tax returns in violation of 26 U.S.C. §7206.

(3) Petitioner pleaded guilty to Counts 3 and 5 of the indictment in February 1992.

(4) Petitioner was sentenced on Count 5 to imprisonment for a period of 12 months to be followed by supervised release for a period of three years. The sentencing judge recommended that petitioner be transferred to community confinement after six months. Petitioner was also fined $25,000. On Count 3 petitioner was sentenced to one year of imprisonment to run concurrently with the sentence on Count 5 and to be followed by a three-year period of probation.

(5) Petitioner has completed his term of incarceration. He will remain on supervised release until August 17, 1996.

(6) At the hearing, petitioner presented a formidable array of lawyers and lay witnesses who testified to his current capability as a lawyer, his moral integrity, his acknowledgement of his past wrongdoing, his remorsefulness for that conduct and the impossibility that he would ever again engage in criminal activity or other conduct that would jeopardize his license to practice law.

(7) He also presented testimony by his current treating psychologist that the mental disorder which brought about his wrongdoing would not recur.

(8) Many of the lawyers testified that petitioner currently possesses the learning in the law expected of practicing attorneys in this Commonwealth. (TR. 40-41, 47-48, 63-64, 85, 100, 109, 130, 135-37, 154-55, 193, 20-, 217-19.) The witnesses described observing petitioner in the library reading advance sheets and cases on a daily basis (TR. 90) and testified about his habit of discussing legal issues with them and several days later faxing pertinent case law. (TR. 130.) One attorney described petitioner's knowledge of the law as "better than any of the law clerks that you get out of law school, even on the Law Review," (TR. 135-37) while another stated that petitioner possessed a "grasp of the law that few match." (TR. 85.)

(9) Many of the lawyers who testified characterized petitioner, despite his conviction, as an honest person of the highest moral integrity. (TR. 23, 32, 42, 49, 65.)

(10) Many of the lawyers presented testimony to the effect that petitioner's reinstatement would not be detrimental to the standing or the integrity of the bar or the administration of justice or subversive to the public interest. (TR. 24, 33-35, 42-43, 51-52, 65-66, 70-71, 80, 85, 116.) Others testified that they would

have "no hesitation" in recommending petitioner for reinstatement. (TR. 125-26, 131, 164, 199, 208, 222.) Several attorneys testified to their confidence that if reinstated, petitioner would be a credit to the bar. (TR. 103, 108, 125-, 222.)

(11) More specifically, the attorney witnesses testified as follows. [A], former chancellor of the [    ] Bar Association (TR. 18) and a former assistant district attorney (TR. 19), tried cases against petitioner over the years. He testified that as a lawyer, petitioner was "tough and he was good." (TR. 20.) Following his suspension, petitioner "changed completely in the sense that . . . he realized the enormity of what had occurred to him, and he was, very moved . . . by what he was going through." (TR. 21-22.) Petitioner expressed remorse to [A] and often the conversation "would end in tears on his side." (TR. 22.) [A] was of the view that the events giving rise to the petitioner's suspension would never happen again. If petitioner were reinstated [A] believes that petitioner would "go far out of his way to be a guiding light to young lawyers." (TR. 22-23.)

(12) [B] has known petitioner since 1965. (TR. 25.) Petitioner helped him to learn his way around the courthouse (TR. 27) and was always very "tenacious" in the courtroom. (TR. 31.) If petitioner were reinstated, [B] would "welcome co-counseling any case with him." (TR. 32.) He believes petitioner would never relapse into the problems giving rise to his suspension because petitioner "is one of those people who learns a lesson, and it stays learned." (TR. 32.) He testified that the administration of justice and integrity of the bar would be "improved by having someone [such as the petitioner] who has come face-to-face with his own humanity and come out of it with a good strong dose

of humility." (TR. 34.) [B] foresees no problem with petitioner representing clients while on federal probation. (TR. 37.)

(13) [C] has known petitioner both professionally and socially for 34 years. (TR. 39.) He characterized petitioner as someone who "loved the law itself." (TR. 39-40.) Since his suspension, petitioner has shown "extreme remorse." (TR. 41.) [C] characterized the events giving rise to the petitioner's suspension as situational and events that would never happen again. (TR. 41-42.) If reinstated he believes petitioner would be "like he was before, [a] very, very strong advocate for his client." (TR. 43.)

(14) [D], a former special prosecutor for the [   ] Division of the United States Department of Justice (TR. 57), has known petitioner for 20 years. (TR. 58.) He represented petitioner's late wife, [E], in the civil tax proceedings arising from petitioner's indictment. (TR. 60-62.) As a result of those proceedings, petitioner has paid over $800,000 to the Internal Revenue Service. (TR. 61.) In discussing the tax issues with petitioner, [D] has found that petitioner is extremely careful as far as his conduct. He not only ensures that his conduct does not violate the law, but more so, that it does not even appear wrong. "He didn't want to give the appearance of impropriety." (TR. 65.) [D] testified that petitioner is now the sole caretaker of his son who lives at home and one of his daughters who is in school. (TR. 62.) [D] believes that petitioner "should practice law again." (TR. 63.)

(15) [F], a former [   ] District Attorney (TR. 67), has known petitioner for nearly 30 years. (TR. 67.) As district attorney, he found petitioner to be a "very skillful, well-prepared lawyer who knew how to operate in a courtroom." (TR. 68.) [F] has found petitioner

to be remorseful for his wrongdoing. (TR. 69.) He believes that petitioner's continuing federal probation will present no problem with respect to petitioner's representation of clients because he has always found petitioner to be "a man whose integrity would never let him compromise the ability with which he has to represent a client." (TR. 70.)

(16) [G], a well-regarded member of the [    ] Bar, has known petitioner since the late 1960s. (TR. 73-74.) He has known petitioner to be "aggressive, studious, kept up with the law, very, very, zealous in his advocacy." (TR. 74.) [G] testified that petitioner has acknowledged his wrongdoing (TR. 78) and has become more subdued. (TR. 79.) He has not, however, seen any change in petitioner's "zeal for the law . . . or his desire to continue to be a lawyer." (TR. 79.) He has no concerns or qualifications about petitioner being reinstated. (TR. 80.)

(17) [H], a practicing lawyer in [    ], first met petitioner in the early 1980s when his former employer, whom petitioner did not know (TR. 255), needed an attorney. (TR. 81-82.) [H] recommended petitioner. (TR. 82.) The employer, a lawyer, had utilized escrow accounts for personal purposes. *(Id.)* Petitioner undertook the representation and made sure that all the clients were reimbursed, even though that resulted in no fee for himself. (TR. 82-83.)

(18) [I], a practicing lawyer, a former city treasurer and city councilman for the City of [    ] (TR. 99), has served as co-counsel with petitioner on a number of cases. (TR. 100.) When [I] was a young lawyer, petitioner always took time to talk cases through with him. (TR. 101.) [I] has found petitioner to be remorseful and he believes that "there is just no likelihood that he would ever" get into further criminal activity. (TR. 101.) [I] believes that petitioner "was a credit to the

bar before, that he was an excellent advocate for his clients and . . . if he ever gets the chance, he would be so again." (TR. 102.)

(19) [J], a former assistant district attorney, has known petitioner for 39 years. (TR. 102.) He believes that if reinstated, petitioner "certainly would be a credit again to the bar association." (TR. 103.)

(20) [K], also a former assistant district attorney, has tried cases against petitioner and has occupied office space next to petitioner's for the last two years. (TR. 103-104.) He found petitioner to be "competent" and "professional." (TR. 105.) In the last two years, petitioner has made his office and library available to [K] and his staff. (TR. 107.) [K] believes that if reinstated, petitioner would continue to be of service to members of the bar and would be a "credit to the bar." (TR. 107-108.)

(21) [L], now a practicing lawyer, received his first employment from petitioner while in law school in 1977. (TR. 111.) He testified that petitioner trained him and that petitioner is "probably the best criminal trial lawyer that I have ever seen and had the pleasure to work with and practice with." (TR. 112.) Despite petitioner's problems, [L] testified that "a lot of people still speak very highly of him, are anxious to see him come back and practice because we all know what a good lawyer he is and how dedicated he is to his clients and to the practice of law." (TR. 113.) Rather than having a detrimental effect, [L] believes that petitioner's reinstatement would be a very positive thing for the legal community." *(Id.)*

(22) [M], a former assistant district attorney, has known petitioner for roughly 20 years. (TR. 114.) He testified that petitioner "enjoyed a good reputation in there among the prosecutors as far as integrity and

effectiveness is concerned." (TR. 115.) He testified that petitioner's reinstatement would not be detrimental to the administration of justice because petitioner is "still an effective attorney who would represent his clients to the best of his ability." (TR. 116.)

(23) [N], now a practicing lawyer, received his first employment out of law school from petitioner roughly eight years ago. (TR. 120.) He testified that when he arrived at the office at 8:30 a.m., petitioner was usually there with clients and that when he left at 6 p.m., petitioner "would still be there waiting for clients, to accommodate them." (TR. 121.) Petitioner was "always accessible" to the young lawyers in the office as well. (TR. 122.) Petitioner encouraged [N] to take pro bono cases because "it is important to give something back to the community." (TR. 123.) [N] testified that he had never seen an attorney "with so much zeal when he went into the courtroom." (TR. 124.) He has no hesitation in recommending petitioner for reinstatement. (TR. 125.)

(24) [O], another practicing lawyer, has known petitioner since 1987. (TR. 128.) He testified that petitioner "would always find the time to stop into my office, even though I wasn't working for [petitioner] . . . and asked me if I needed any advice on any cases." (TR. 130.) [O] had no hesitation in recommending petitioner for reinstatement. (TR. 131.)

(25) [P] has known petitioner personally for 40 years and professionally for 12. (TR. 132.) When [P] first became a lawyer, petitioner always "took the time to help." (TR. 133.) Petitioner has expressed remorse for his wrongdoing to [P], once even breaking down into tears. (TR. 134.) [P] would not hesitate to recommend petitioner for reinstatement. *(Id.)*

(26) [Q], one of the petitioner's law school classmates and a close personal friend (TR. 150-51), also testified. He found petitioner to be an "excellent lawyer." (TR. 151.) During petitioner's criminal proceedings, [Q] was at his side most of the time. He believes that petitioner has acknowledged his wrongdoing and has done "everything humanly possible and then some" to set the record straight. (TR. 156.) In fact, "things were almost looking normal between" petitioner and his wife prior to her untimely death. (TR. 160.) [Q] testified that petitioner would never again resort to criminal activity: "He is our conscience now. I mean, he's gone from just being a lawyer to being so careful that he's constantly yelling at me and his son [R] who is also in our office, I mean, don't forget to call your clients back." (TR. 158.) [Q] perceives no difficulty with petitioner representing clients while on supervised release because "he's dedicated to his clients, he's well versed in the law, he's fanatical about his approach to trying cases." (TR. 161-62.) [Q] testified that petitioner's period of supervised release will not present a conflict because petitioner will be required to disclose his probationary status to clients. (TR. 162.) He observed petitioner disclosing to clients the fact of his indictment prior to his incarceration. *(Id.)*

(27) [S], a practicing lawyer in [   ], has known petitioner for 30 years. (TR. 202.) He described petitioner as "still my mentor in the area of criminal law." (TR. 205.) [S] testified that "I don't think [petitioner] realized how essential [the practice of law] was to his life. And I don't think he would ever let anything happen to jeopardize that again." (TR. 206-207.) If petitioner were reinstated [S] would be "willing to stake my license along with his." (TR. 208.)

(28) [T], a practicing lawyer in [    ], has known petitioner personally and professionally for the last 25 years. (TR. 216.) He and petitioner have had almost daily conversations over the last two years. (TR. 222.) [T] testified that "the practice of law is clearly [petitioner's] abiding interest in life. And not being able to practice law has been a cross that has been very, very difficult for him to put up with." (TR. 220.) He described petitioner as "to some extent punishing himself more than the legal system is, and he still feels terribly riddled by guilt and embarrassment he's caused his family." (TR. 221.) [T] nevertheless believes that petitioner is "rising above it, and I think it is an ordeal that has left such a profound mark on him. I can't think of anybody who would be less likely to do anything even close to inappropriate than [petitioner] because I can't believe that he would want to inflict this on himself or his family again." *(Id.)* He has no hesitation in recommending petitioner for reinstatement. (TR. 222.)

(29) [U], a former assistant district attorney, has known petitioner for 25 years and has tried cases against him. (TR. 223-24.) The two also practiced law together for a time. (TR. 224.) [U] has always found petitioner to be a zealous advocate. (TR. 224.) Petitioner has been "devastated" by his suspension and very remorseful. (TR. 226.) If reinstated, however, [U] believes that petitioner would once again be the zealous advocate he was in the past. (TR. 228.)

(30) Petitioner also presented testimony from family members, friends and former clients. For example, petitioner's brother, [V], testified that petitioner has acknowledged his wrongdoing and has done his best to set the record straight with his late wife and family. (TR. 96-97.) His other brother, [W], testified that with

respect to petitioner's wrongdoing, "you can read it in his face everyday. There's a lot of pain there, just a lot of pain." (TR. 211.) Petitioner has worked hard to set things straight with his family (TR. 212) and was the caretaker of his late wife's father. (TR. 214.) [W] testified that "I personally believe that the law provided him the opportunity to help a great many people . . . and if he is reinstated, it is certainly going to take place again, perhaps even on a larger scale, so there is no question about that." (TR. 211.)

(31) Prior to his suspension, petitioner practiced law with his son, [R]. (TR. 189.) Petitioner now works for his son as a paralegal. (TR. 193.) During his suspension, petitioner has scrupulously adhered to all the Disciplinary Rules and he and [R] have periodically consulted with counsel to ensure that their actions are proper. (TR. 193-94.) If petitioner were reinstated, [R] would employ him as a salaried employee. (TR. 201.) [R] testified that petitioner has tried to make amends with his family. [R] testified that "it consumes him at every moment of the day." (TR. 198.) Public disclosure of petitioner's problems has eliminated the pressure that gave rise to his criminal activity. *(Id.)*

(32) [X], a former detective in the [    ] Police Department, and current private detective, has known petitioner for 25 years. (TR. 88-89.) When [X] became a private detective, petitioner counseled him "to be above board, watch your taxes, make sure everything is done properly."(TR. 91.) Petitioner has expressed remorse for his wrongdoing. (TR. 92.) [X] believes that petitioner is now a "changed person" who is better able to deal with his problem. (TR. 92-93.)

(33) [Y], a boyhood friend of petitioner (TR. 139) and godfather to one of his children (TR. 140), testified that petitioner has expressed remorse for his wrongdoing

(TR. 141) and tried to set things right with his late wife. (TR. 142.) As a result of his difficulties, petitioner's personality has become more introverted. (TR. 143.)

(34) [Z], a former court officer, court crier, and bail commissioner, has known petitioner for over 40 years. (TR. 145-46.) She has witnessed petitioner in the courtroom and found that he "always came to court prepared, he was always a gentleman, always knew his work, was respected by everybody who worked in the system. (TR. 146-47.) A few years ago, when she required counsel, [Z] retained petitioner. (TR. 147.) She felt "so confident with him." (TR. 148.) Although petitioner is currently on supervised release, [Z] would retain him today if needed because "I still have that feeling that I would best be served by a person with his integrity, his honesty, his compassion. I still would need that kind of a lawyer." (TR. 148.)

(35) Other former clients echoed those sentiments. For example, [AA] submitted a letter stating that "[petitioner] is a wonderful person and reinstating him to practice law would be a wonderful thing for the State of Pennsylvania." (PX 5.) [BB] writes that "In reference to petitioner's readmittance to the Pennsylvania Bar, I am in complete support of his request and consider him to be fully capable of continuing to practice law. He is a long-time friend and business associate whom I continue to admire and respect. I would not hesitate to call upon him for assistance in the future." (PX 7.) Yet another former client, [CC], submitted a letter stating that "I honestly know of [petitioner] as an excellent lawyer and more than that he is first a wonderful and understanding person." (PX 8.)

(36) Petitioner also presented the testimony of Dr. [DD], the psychologist who treated him both before and after his imprisonment. Dr. [DD] was first contacted

by petitioner's late wife who was struggling to understand petitioner's prior actions. (TR. 172.) Petitioner was "very upset, very guilty." (TR. 173.) Dr. [DD] concluded that "the key thing for [petitioner] in terms of resolving some of the poor judgments that he made and tendency to make those poor judgments was to develop a better ability to face uncomfortable feelings and work them through." (TR. 174.) Petitioner has committed to meet with Dr. [DD] weekly until those issues are resolved. (TR. 176.) Consistent with the testimony of petitioner's close friends, Dr. [DD] has seen "a whole lot of change" since 1992. *(Id.)* He testified that "both external circumstances and internal dynamics have attenuated to such an extent that it seems unlikely that the problems which caused his professional suspension should recur." (PX 4; TR. 177-78.) Dr. [DD] concluded that petitioner is "not a man who is going to do anything to jeopardize his ability to provide for his family again easily." (TR. 179.) As he phrased it in his report:

"The legal and disciplinary measures which [petitioner] has endured have caused so dramatic a reevaluation that [petitioner] is fundamentally changed as a result. The primacy of his family responsibilities and the contingency of these on his professional practice have underscored for [petitioner] the ethical canons of the profession." (PX 4.)

(37) Petitioner also testified in his own behalf. Petitioner explained that he had reached an agreement with the Internal Revenue Service concerning his civil tax liability. Under the agreement, petitioner must pay $1,015,000 in addition to the $900,000 he has already paid. (TR. 229-30.) The only asset petitioner has to satisfy the remaining debt is the family home, which is to be sold immediately and which should bring another $250,000 to the government. (TR. 231.) In addition,

the Internal Revenue Service is seeking to levy on a $300,000 annuity which by agreement with the IRS would have gone to petitioner's children had his late wife changed the beneficiary prior to her untimely death. (TR. 230-31.)

(38) Petitioner also described the paralegal work he has performed since his release from prison. In that time he has researched various legal issues for his son [R] and for several other practicing lawyers. (TR. 234.) He also reads advance sheets and legal periodicals and has taken the mandatory Pennsylvania basic practice course. (TR. 235.) Petitioner described the daily care he provided to his father-in-law, who was stricken with cancer and died the day after petitioner's wife. (TR. 245-47.)

(39) Petitioner testified that he believes he has progressed in his work with Dr. [DD]. He agreed with the doctor that the primary difficulty he now needs to work through involves his tangled family relationships. (TR. 237, 251.) He is committed to continuing his therapy with Dr. [DD]. (TR. 252-53.)

(40) With respect to reinstatement petitioner testified as follows (TR. 238-39):

"My intention is to return myself to some dignity and the only way I can do that is by the practice of law and doing it well, doing it properly and attempting to get some respect back to the families involved and my family."

He concluded that "There is nothing in the world that I would do in any way to jeopardize my position as an attorney. I don't care what it may be. From here on in I don't care what it may be." (TR. 252.)

## III. DISCUSSION

The sole question to be determined is whether petitioner's request for reinstatement to the bar of the Supreme Court of Pennsylvania should be granted. In order for petitioner to gain reinstatement to the practice of law he has the burden of demonstrating, by clear and convincing evidence, that he has both the moral qualifications and the competency and learning in the law required for admission to practice law, and that the resumption of the practice of law will neither be detrimental to the integrity of the bar or the administration of justice, nor subversive to the public interest. Pa.R.D.E. 218(c)(3)(i). Therefore, the main focus of the reinstatement proceeding is "whether the disciplined attorney is now morally fit and technically competent to engage in the practice of law." *Philadelphia Newspapers Inc. v. Disciplinary Board of the Supreme Court,* 468 Pa. 382, 386 n.6, 363 A.2d 779, 781 n.6 (1976).

Petitioner was convicted of two counts of tax evasion in violation of 26 U.S.C. §7201. His conviction stemmed from his failure to report cash fees for the period 1985 through 1989 in the amount of approximately $1,235,230.74 and his failure to pay tax to the United States government in the amount of approximately $475,212.93. During the relevant time period (1985-1989), petitioner maintained two separate families and households. He claimed that he did not report this income because he feared that his wife would learn the existence of the second household.

Petitioner has been suspended from the practice of law since October 2, 1992. During that period of time he has worked as a paralegal with his son who is a practicing attorney. He is not engaged in the practice of law.

Petitioner has shown substantial remorse for his misconduct. There is no question but that he recognizes the severity of his criminal conduct.

Petitioner has always enjoyed an excellent reputation in the community. Many prominent attorneys and members of the community testified on petitioner's behalf at the reinstatement hearing. Petitioner received glowing accolades from all who testified. He was characterized as a zealous and tireless advocate and a knowledgeable and caring mentor. But for the misconduct at issue, petitioner has enjoyed and continues to enjoy an outstanding reputation.

Petitioner has completed his period of incarceration and currently works as a paralegal. He has reached agreement with the Internal Revenue Service relative to his tax liability and has paid approximately $900,000 in tax, interest and penalty. He still owes the IRS approximately $1 million and is making a substantial effort to fulfill his obligation. The Hearing Committee readily concluded that petitioner was morally qualified to resume the practice of law. Office of Disciplinary Counsel filed no exceptions. The board concurs with the committee's conclusion.

Petitioner is also required to prove by clear and convincing evidence that he has the competency and learning in the law required for reinstatement. Petitioner has continued to read legal periodicals including *Criminal Law Reporter, Atlantic Reporter* advance sheets and the *Georgetown Law Journal.* He has also successfully completed the eight-hour Pennsylvania basic practice course at [    ] University. He has also researched a wide variety of legal issues while employed as a paralegal by his son, [R]. The Hearing Committee concluded that petitioner had demonstrated his competency and learning in the law and the board agrees.

Petitioner engaged in criminal conduct which brought dishonor to him and to the profession. He and his family suffered greatly as a result of his conduct. Petitioner was suspended from the practice of law for a period of 30 months by this honorable court. Petitioner has, however, rehabilitated himself and has demonstrated by clear and convincing evidence that he has the requisite moral character and learning in the law required for reinstatement. As counsel for the respondent stated at the reinstatement hearing: "I don't think any reasonable reader of this record is going to find anything but that [petitioner] has met his burden." (N.T. 258.)

## IV. CONCLUSION OF LAW

The board finds that petitioner has met his burden by showing through clear and convincing evidence that he has the moral qualifications, competency and learning in the law required for admission to practice law in this Commonwealth and that the resumption of practice will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest. Pa.R.D.E. 218(c)(3)(i).

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that petitioner, [     ], be reinstated to the practice of law.

The board further recommends that, pursuant to Pa.R.D.E. 218(e), petitioner be directed to pay the necessary expenses incurred in the investigation and processing of the petition for reinstatement.

Board Members Paris and Carson did not participate in the adjudication.

## ORDER

And now, November 13, 1995, upon consideration of the report and recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania dated October 6, 1995, the petition for reinstatement is granted.

Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.

Mr. Justice Castille did not participate in this matter.

Mr. Justice Montemuro participates by designation as a senior judge as provided by Pa.R.J.A. no. 701(f).